(No. 6965. October 28, 1942.)

WILLIAM OHMS, ALBERT OHMS, HENRY OHMS, EMMA DAVIS, CARRIE APPLINGTON PARKER, DORA DONNELLY, MAE TWIST CALLENDER, DAN OHMS and MABEL HARE, Appellants, v. THE CHURCH OF THE NAZARENE, WEISER, IDAHO, INC., and ED. R. COULTER as Executor of the Estate of Lou Ohms, deceased, Respondents.

[130 Pac. (2d) 679.]

Frank D. Ryan, B. W. Oppenheim and W. B. Bowler for appellants.

Logan D. Hyslop and George Donart for respondents.

GIVENS, C.J.—Appellants are respectively the children and one grandson of apparently the second marriage of Otto Ohms, deceased. This marriage was consummated and continued while the deceased was living in Oregon, during which time he accumulated an estate variously estimated at about $40,000, which some time prior to 1918 was divided between him and his second wife upon their divorce, whereupon he moved to the Weiser Valley in Idaho, later marrying

a widow with children. There is uncertainty as to whether he lost the money he had when he came to Idaho, but in any event, he later again accumulated considerable property, among which was the forty acres in question herein. Upon the death of the wife whom he married upon first coming to Idaho, he married, November 6, 1918, his last wife, Lou Ohms, a maiden lady of years, now deceased.

March 20, 1931, Otto Ohms deeded the forty acres in question to his then wife, Lou Ohms. March 23, 1931, they made mutual, reciprocal, concurrent wills (*Deseumeur v. Rondel*, 76 N. J. Eq. 394, 74 Atl. 703), devising and bequeathing all of the property of which either might die seized or possessed to the other, as follows:

"In the event that my beloved wife Lou Ohms shall be living at the time of my death, I do will and bequeath unto her absolutely all of the real and personal property whatsoever, of every name and nature, which I may own at the time of my death, the same to be hers absolutely.

Should my beloved wife Lou Ohms die before I pass on, then it is my express will and desire that all of the property, both real and personal, of which I may die possessed, shall be divided share and share alike, between my children, William Ohms, Albert Ohms, Henry Ohms, Emma Davis, Carrie Applington, Dora Donnelly, Mae Twist, Dan Ohms, Mable Moore, and one share to Ray Patton and Harvey Patton, the surviving children of my deceased daughter, Sarah Ohms Patton."

"Should my beloved husband Otto Ohms survive me, then it is my express will and desire and I do hereby will and bequeath to him all of the real and personal property of every name and description owned by me at the time of my death. Should I survive my beloved husband Otto Ohms, then, at the time of my death I hereby will and direct that all of the property of every name and description which I may own at the time of my death shall be divided, share and share alike between the following children and heirs at law of Otto Ohms my husband, to-wit:" [Here follow the names of the children and grandchildren of Otto Ohms, named in his will.]

Coincidentally, they executed a mutual contract providing that in consideration of the execution of said wills they agreed that all property owned by the one dying last should go to the children of Otto Ohms (appellants herein, including the grandson who holds his deceased parent's share).

"WHEREAS, It is the express will and desire of each of said parties that upon the death of either one of them all of the property owned by the other at the time of his or her death, shall go to, and become the property of the surviving member of this marriage, and at the death of the last member of the marriage, all of the property owned by the one dying last shall go to the children of Otto Ohms."

June 6, 1934, Otto Ohms died testate, and Lou Ohms acceded to his property, appraised at $2,475. Thereafter, Lou Ohms on November 7, 1934, and October 22, 1935, made other wills at variance with the above will of March 23, 1931, and the contract mentioned. Subsequently, November 3, 1938, being informed that said wills were in conflict with the contract, and being advised that she could not will this property to the church because the same would be a breach of the contract above mentioned, she revoked the previous wills by will made that day, reviving the terms and provisions of her first will, and deeded the land in question, valued at $2,500, to respondent church.

Following the death of Lou Ohms, July 23, 1939, her executor did not list the property in question as an asset of her estate, otherwise appraised at $2,092.29, on the theory that the deed was valid. Thereupon, the present action was instituted in equity by appellants to set aside the deed on the ground it was contrary to the intent and purpose of the contract above mentioned, also urging that it was obtained through undue influence. The latter contention has been entirely abandoned, and the matter is before us solely upon the question of whether or not the contract prohibited the giving of this deed. The trial court held the deed was valid and was not in violation of the contract because there were no restrictions upon the right of Lou Ohms to convey the property during her lifetime.

Appellants urge that the plain intent and purpose of the contract was that except for necessities (*Heller v. Heller*, (Tex.) 233 S. W. 870; *Sample v. Butler University*, 211 Ind. 122, 4 N.E. (2d) 545, 5 N.E. (2d) 888, 108 A.L.R. 857) for the physical care and maintenance of the survivor, all property received by either at the death of the other was to be kept intact to pass upon the death of the survivor to the children of Otto Ohms, and that alienation during the life of the survivor, though not expressly prohibited, had the same effect as violative testamentary disposition. On the other hand, respondent contends that if the parties had

intended that there should be no transfer by and during the lifetime of the survivor, the contract could and should have so specified. There are but few cases which have considered this precise point and line of demarcation. The following hold that such a transfer, being in the nature of a subterfuge, will not be sustained. (*Bower v. Daniel,* 198 Mo. 289, 95 S.W. 347; *Ralyea v. Venners,* 155 Misc. 539, 280 N.Y.S. 8; *Daniels v. Aharonian,* 63 R.I. 518, 9 Atl. (2d) 865; *Sample v. Butler University,* supra; *Price v. Aylor,* 258 Ky. 1, 79 S.W. (2d) 350.)

Opposed to the above doctrine are the following authorities which hold that nothing should be read into the contract and that property may be thus disposed of. In re Salisbury's Estate, 242 App. Div. 645, 272 N.Y.S. 135; *National Life Ins. Co. v. Watson,* 141 Kan. 903, 44 Pac. (2d) 269; *Dickinson v. Lane,* 193 N.Y. 18, 85 N.E. 818, 20 L.R. A.N.S. 1154. The court in *National Life Ins. Co. v. Watson,* supra, stated:

"Judgment was entered accordingly, and the intervening defendants appeal, contending here, as they did below, that the joint will of Martin and his first wife was contractual, and bound him especially since he elected to take under its provisions made in his behalf.

There is no gainsaying the soundness of these contentions, but just how far and to what extent do they affect the validity of plaintiff's mortgage? By the joint will, Martin Childers impliedly agreed that whatever property he may die seized of shall pass under that will to the seven children named in its fifth paragraph quoted above. He did not bind himself not to alienate or dispose of any of his property during his life as his own wants, needs, or convenience might require. When Martin Childers joined in the execution of the mutual and reciprocal will of himself and his first wife, he did not thereby intend to disable himself to exercise dominion over his own property. Certainly he had a right to borrow the $2,000 sued for in this action. And the judgment creditor could certainly have subjected this particular 100 acres to execution sale to the satisfaction of its judgment without a mortgage lien thereon, since it was not the homestead of Martin and his second wife. They reside on the 20 acres on which he enjoys the life estate devised to him by his first wife.

"We have not overlooked the many interesting cases which the industry of counsel for appellants has revealed

for our perusal; but as was said in *Morse v. Henlon*, 97 Kan. 399, 155 P. 800, 'there is no occasion for employing rules of judicial construction of a will in search of the testator's intention, where such intention is expressed clearly and unequivocally in the instrument.' "

There is support for the proposition that even after or in spite of such alienation there remains a sufficient consideration to support the contract in this, that whatever property is left will pass as provided for in the contract, when otherwise the survivor might have made any disposition he or she desired.

While there was no estrangement between appellants and Otto and Lou Ohms, there was practically no communication between appellants and Otto Ohms after he left Oregon, no visiting, and apparently he was assisted in accumulating the money which went into the purchase of this particular property by the children (by her former marriage) of the wife whom he married upon first coming to Idaho.

After her death and his marriage to Lou Ohms, the latter not only contributed to the community (not this piece of realty) by property which she owned at the time of her marriage, but by her efforts after the marriage. The evidence is also clear and undisputed that members of the respondent church were solicitous and kind in the care and attention they gave to Mrs. Ohms during the last years of her life and her final illness. Lou Ohms certainly contributed more to the retention of this property than did appellants, since the evidence indicates that the bulk at least of the property or money which Otto Ohms had when he came to Idaho was lost and dissipated prior to the time he acquired this particular piece of property.

As generally stated, the lodestar is the intention of the parties, and that the disposition during the lifetime, if not prohibited, must be reasonable. (*Rastetter v. Hoenninger*, 214 N.Y. 66, 108 N.E. 210.)

The contract and the joint wills of Otto Ohms and his wife, Lou, clearly stated that all property which they owned at the time of the death of one of them should become the property of the survivor, absolutely, and that any property remaining in the ownership of the survivor, at the time of his or her death, should go to his children and grandchildren, named in the wills. There is no restriction,

other than above stated, expressed in these documents, and none may legitimately be implied therefrom.

In the preparation of their contract and wills, Mr. and Mrs. Ohms had the benefit of the assistance of an able and trustworthy member of the bar of this state, and there is no reason to believe the clear language employed therein does not correctly show their wishes and intentions. Courts should construe contracts according to the plain language used by the parties in making them, and we should not, in this or any other case, substitute what we may think the parties should have agreed to for what their contract shows they did agree to.

By the terms of her contract Lou Ohms was obligated to leave to her husband's children and grandchildren, if she survived him, all the property of which she died seized. That did not include property which she had owned absolutely and which she had given away prior to her death.

Balancing the fact that appellants, as the children and grandson of Otto Ohms, would be the natural recipients of his bounty against the fact that they did not assist in the accumulation of the property and that Lou Ohms did in its retention, and that respondents ministered to her needs and necessities during the latter portion of her life, and that, according to the evidence, she felt it was comforting, if not necessary, to her spiritual needs that this disposition of the property be made, can we say that her act was unreasonable? Dickinson v. Lane, supra. While it is true there is strong reason to conclude that the implied meaning of the contract was against this alienation during her lifetime, it still remains that such prohibition must be implied and is not expressly contained in the contract. Furthermore, conceding that the deed from Otto Ohms to his wife, March 20, 1931, as to testamentary disposition by her did not change the status of title to the forty acres, in other words, that all property held by her at her death would pass equally, irrespective of how she derived title thereto, such transfer cannot be ignored in determining what their intentions were as to this property; and evidently Otto Ohms desired, though legally he had not effected such desire, that this forty, as to his wife's dominion thereover, be in a different category than the other property of which she might be possessed. Such thought is not inconsistent with giving effect to the lack of restriction on alienation during the life of the surviving spouse because as to the

contract we recognize the absence of such phrase, as to the deed from him to her we pay attention to the affirmative act. Insofar as the equities may be considered, therefore, there is more justification for leaning to the thought that it was the intention of the parties as expressed in the contract and the mutual wills that during the life of the surviving spouse the property might be handled without restriction other than as to testamentary disposition.

The above analysis leads legitimately to the conclusion that Otto Ohms had in mind that his wife during her life might dispose of the forty as she saw fit, making it, if still in her possession at her death, subject to their will. Even though she understood she could deed but could not will, it was not an evasion or subterfuge if no restriction on deeding was intended.

The dividing line is close, i.e., between upholding alienation as not prohibited by the contract and invalidating testamentary disposition because proscribed. It is better to give effect to the contract as made by the parties than attempt construction by implication or insertion by inference. (*Messinger v. Cox,* 33 Ida. 363, 194 Pac. 473; *Holverson v. Evans,* 38 Ida. 428, 224 Pac. 1067; *Sorensen v. Larue,* 43 Ida. 292, 252 Pac. 494; *Ehlinger v. Washburn-Wilson Seed Co.,* 51 Ida. 17, 1 Pac. (2d) 188; *Weed v. Idaho Copper Company,* 51 Ida. 737, 10 Pac. (2d) 613; *Farm Credit Corporation v. Meierotto,* 50 Ida. 538, 298 Pac. 378.) *If it was* the intention of the parties that what each might receive upon the death of the other should be kept intact and passed on without any diminution thereof to Otto Ohms' children, the contract should have so stated, which it did not.

Recognizing the full force and effect of the argument that this deed accomplished the same result as though there had been violative testamentary disposition, it seems better to adhere to the proposition that the contract will be enforced as it reads, and that since the makers thereof did not see fit to incorporate in it restrictions upon alienation during the life of the other, the contract will be limited to the restrictions therein contained, namely, against testamentary disposition. The deed was not testamentary in character because title immediately vested in the grantee reserving only a life estate. (*Cell v. Drake,* 61 Ida. 299, 100 Pac. (2d) 949.)

The trial judge was thus sufficiently justified in finding

for respondent, and the judgment is affirmed. Costs to respondent.

Budge, Morgan, and Holden, JJ., concur.

This opinion was written and agreed upon prior to the death of Morgan, J., October 16, 1942.

AILSHIE, J. (Dissenting)—Aside from a marriage contract itself, I can think of no more sacred contract than that between husband and wife, for the making of mutual and reciprocal wills, and the final disposition of the property after their decease. The contract for disposition of their property, after death of the first to pass, and the final disposition to be made of the remainder, upon the passing of the surviving member of the marital community, in this case, was fully executed on the part of the husband at the time of his death. The wife claimed and received the husband's entire estate, *both separate and community;* and she was bound in equity and good conscience to live up to the contract on her part. After one of the parties has complied with the contract and passed into silence, and can no longer protest any violation of the contract; and the survivor is left, subject alone to the friendly and kindly favors of others, and acquires new contacts and associations, and receives and experiences the solace and comforts, social, spiritual or otherwise, often bestown, it is then that the court of equity may be called upon to enforce the original contract.

It is suggested in the majority opinion that, "there is no restriction" expressed in the documents (will and contract) against alienation of property by the survivor; and that "none may legitimately be implied therefrom." It seems to me that the contract should be read and understood, in the belief that it was entered into in good faith by both parties; and certainly it would not be *good faith,* on the part of the survivor, to *give away* the property acquired through the will of the decedent, to prevent the final residuary devises named in the will from taking anything under the wills so executed. In other words, it must be assumed that the intent was to leave the property to the survivor, on the death of the first member of the marital community, for his or her use and benefit during life. That use and benefit might be exercised in any reasonable and fair way; but it certainly did not contemplate dissipation of the property during the lifetime of the surviving spouse and

*outright gifts and donations of the substantial part of the estate.*

The contract entered into contains the following provision:

"WHEREAS, It is the express will and desire of each of said parties that upon the death of either one of them all of the property owned by the other at the time of his or her death, shall go to, and become the property of the surviving member of this marriage, and at the death of the last member of the marriage, all of the property owned by the one dieing last shall got to the children of Otto Ohms.

"NOW, THEREFORE, in consideration of the premises, and for the purpose of carrying out this express desire, each of the parties has this day executed his and her will, copy of which is attached to and by reference made a part of this agreement. In consideration of the execution of said wills disposing of said property in accordance with the desire hereinbefore expressed, each of the parties hereby contracts and agrees, one with the other, that neither one or the parties hereto shall ever, at any time, revoke cancel or in any manner modify or change either one of said wills so this day executed."

This contract had attached to it, and *as a part thereof,* the mutual wills referred to, which contain the following paragraph:

"In the event that my beloved wife Lou Ohms shall be living at the time of my death, I do will and bequeath unto her absolutely all of the real and personal property whatsoever, of every name and nature, which I may own at the time of my death, the same to be hers absolutely."

Certainly such a devise of an estate contemplates a *substantial and reasonable* use of the property by the survivor, "even to the extent of exhaustion." (*Price v. Aylor,* 258 Ky. 1, 79 S. W. (2d) 350, at 352.) On the other hand, good faith on the part of such surviving spouse forbids the survivor giving away such a substantial part of the estate as to defeat the chief purpose of the residuary bequest. (*Sample v. Butler University,* 211 Ind. 122, 4 N. E. (2d) 545, 108 A.L.R. 857, at 868; *Price v. Aylor,* supra; *Moore v. Moore,* (Tex. Civ. App.) 198 S. W. 659; *Schramm v. Burkhart,* 137 Ore. 208, 2 P. (2d) 14, 17.) The latter is just what has been done in this case. In such case, it is unnecessary to prove *actual* or *intentional fraud.* The fraud will

rather be determined "by the facts and circumstances under which the transfer was made and from which the law imputes a fradulent motive." (*California Consol. Min. Co. v. Manley*, 10 Ida. 786, 81 P. 50; 9 Am. Juris., p. 372, sec. 26.) In other words, if the result accomplished defeats justice, it will amount to fraud.

It seems to me that it does violence to the contract itself and to all the rules of construction, to hold that the contract, as such, for mutual wills, was valid and binding; and, at the same time, to hold that the survivor might dispose of all the property *by gift*, in such a way as to prevent the ultimate beneficiaries, named in the contract and will, from realizing the bequest, which was expressly intended for their benefit, after the death of the survivor of the community.

Whether it be a gift in praesenti, completed by delivery, or a gift by will, to be completed at death, in either case, it is a *gift*. Now, if A contracts, for a consideration, to leave by will his property to B, he can not avoid his contract, after receipt of the consideration, by making an outright gift of the property to C in his lifetime.

The same contention made here was urged in *Sample v. Butler University*, 211 Ind. 122, 4 N. E. (2d) 545, at 546 and 548, 108 A.L.R. 857, wherein the will contained the words "which I may own at the time of my death"; and the court said: "But such a construction does violence to the very agreement which the wills were made to carry out." (*Doyle v. Fischer*, 183 Wis. 599, 198 N. W. 763, 33 A.L.R. 733; *Ankeny v. Lieuallen*, (Ore) 113 P. (2d) 1113, at 1118-19; *Baker v. Syfritt*, 147 Iowa 49, 123 N. W. 998, 1001.)

Here was a considerable estate and, except for this contract, the husband might have disposed of one-half of the community estate and two-thirds of his separate property to his children, or any one other than his wife; or had he died intestate, the estate would have descended, in the same proportions, to his children, appellants herein. (I. C. A., secs. 14-102, 14-113, 14-114.) So it will be seen, that the surviving spouse succeeded, under this contract and mutual will, to twice (or thrice) as much estate as she would have received, had the husband died intestate or chosen to devise one-half (or two-thirds) his estate to some one other than his wife. Conversely, appellants lost such share, or shares,

of the estate by reason of this contract and will, through the holding of this court, as stated by the majority opinion. The judgment should be reversed.