*In re* LEIX ESTATE

Docket No. 291406. Submitted June 8, 2010, at Detroit. Decided August
     26, 2010, at 9:20 a.m.

     Carlton E. Leix and Melinda Triplett petitioned the Genesee County
          Probate Court for the imposition of a constructive trust on certain
          assets in the control of respondents, Melady A. and Jeffrey Perry.
          Petitioners alleged that Carlton J. Leix had transferred the assets
          to Melady Perry in violation of a 1982 agreement between Carlton
          J. Leix and his wife, Viola Leix, to execute mutual wills. Carlton J.
          and Viola Leix had executed identical wills, a revocable-trust
          agreement, and an agreement to execute mutual wills in 1982. The
          wills, trust, and agreement for mutual wills reflected an estate
          plan calling for the establishment of a trust for the benefit of
          Melady Perry for life, with the remainder to the issue of Carlton J.
          and Viola Leix. Carlton E. Leix is the son of Carlton J. and Viola
          Leix, and Melady Perry and Melinda Triplett are the daughters of
          Arletta Cady, their deceased daughter. Viola Leix died in 1983.
          Carlton J. Leix died in 2008 and, at that time, nearly all the
          disputed assets were titled jointly in his and Melady Perry's names
          or named Melady Perry as the beneficiary. Petitioners moved for
          summary disposition and, following a hearing on the motion, the
          court, Jennie E. Barkey, J., granted summary disposition in favor
          of Melady and Jeffery Perry, holding that the agreement to execute
          mutual wills was valid and binding and that Carlton J. Leix's
          transfers of assets into joint ownership with Melady Perry after
          Viola Leix's death were not in breach of the agreement to execute
          mutual wills because the agreement contained no restrictions
          against transfers. Carlton E. Leix appealed.

     The Court of Appeals *held*:

     Implied limitations on the transfer of assets by the surviving
     spouse in the case of an agreement to make mutual wills are not
     recognized in Michigan. Nor does Michigan recognize a cause of
     action for breach of an implied covenant of good faith and fair
     dealing. A contract to make a mutual will is subject to the
     following principles: (1) the main goal of contract interpretation is
     to enforce the parties' intent, (2) when the language of a document
     is clear and unambiguous, interpretation is limited to the actual

words used, and parol evidence is inadmissible to prove a different intent, (3) an unambiguous contract must be enforced according to its terms, and (4) courts may not rewrite contracts on the basis of discerned reasonable expectations of the parties. The agreement did not restrict Carlton J. Leix from disposing of the assets as he saw fit regardless of whether the transfers were made for the purpose of avoiding the testamentary disposition.

Affirmed.

DECEDENTS' ESTATES — AGREEMENTS TO MAKE MUTUAL WILLS — IMPLIED LIMITATIONS ON TRANSFERS OF ASSETS — IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALING.

Michigan does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing and does not recognize implied limitations on the transfer of assets by the surviving spouse in the case of an agreement to make mutual wills.

*Rizik & Rizik* (by *George F. Rizik, II*) for Carlton E. Leix.

*Reid & James, P.C.* (by *Robert J. Reid* and *Robert Brace Reid*), for Melady A. and Jeffrey Perry.

Before: ZAHRA, P.J., and CAVANAGH and FITZGERALD, JJ.

PER CURIAM. This case concerns the disposition of assets formerly owned by Carlton J. Leix (Carlton) and his wife, Viola Leix. After Viola's death, Carlton transferred the assets so that they were jointly owned with their granddaughter, respondent-appellee Melady A. Perry. Petitioner-appellant, Carlton E. Leix (appellant), the son of Carlton and Viola, contended that the transfers violated his parents' agreement to execute mutual wills. Appellant appeals as of right the judgment granting summary disposition pursuant to MCR 2.116(I)(1) in favor of Melady and her husband, respondent-appellee Jeffrey Perry (hereafter referred to jointly as "respondents"), on the ground that the agreement to execute mutual wills did not restrict Carlton from making the transfers. We affirm.

I

Carlton and Viola had two children, appellant and Arletta Cady. Arletta was the deceased mother of Melady and petitioner Melinda Triplett. On September 30, 1982, Carlton and Viola executed identical wills, a revocable-trust agreement, and an agreement to execute mutual wills. The wills, trust, and agreement for mutual wills reflected an estate plan that called for establishing a trust for the benefit of Melady for life, with the remainder to the issue of Carlton and Viola. Viola died on December 11, 1983.

Carlton executed amendments of the trust in July 1988 and October 2000.[1] He also transferred title to assets that had been owned by Viola and him. For example, Carlton withdrew money from bank accounts and, in 2001 and 2002, purchased annuities that named Melady as the beneficiary. He added Melady as a joint owner on a checking account in 1984, closed the account in 2006, and then opened a new checking account with Melady as a joint owner. In 1994, he conveyed real estate to himself, Arletta, and Melady as joint tenants with rights of survivorship.

In 2006, Melady became Carlton's guardian and conservator. Carlton died in July 2008. At the time of Carlton's death, nearly all the assets were titled jointly in his and Melady's names or named Melady as the beneficiary. After Carlton's death, Melady received the money from the annuities and placed some of it in certificates of deposit in her name and in the name of her husband.

Appellant and Melinda brought this action in the probate court, requesting that the court impose a constructive trust on certain assets in the control of respondents.

---

[1] Appellant does not claim that the amendments of the trust breached the agreement to execute mutual wills.

They alleged that Carlton transferred the assets in violation of his and Viola's 1982 agreement to execute mutual wills. They filed a motion for summary disposition pursuant to MCR 2.116(C)(10) and, in support thereof, submitted the deposition transcripts of (1) Michael James, the attorney involved in drafting the original estate plan documents, (2) Robert Reid, the attorney who drafted an amendment of the trust, and (3) Melady. James could not recall Carlton and Viola's intent when executing the original documents, and Reid was not involved with the original documents. Melady testified about the family's relationships and the accounts, but stated that she had never discussed Carlton's estate plan with him.

Following a hearing on the motion, the trial court found the agreement to execute mutual wills to be valid and binding, that nothing in the agreement put any restrictions on what the surviving party could do with the parties' assets, and that Carlton's transfer of assets during his lifetime and his amendment of the trust did not constitute a breach of the agreement.[2] The court therefore granted summary disposition in favor of respondents.

II

Summary disposition pursuant to MCR 2.116(I)(1) is appropriate if "the pleadings show that a party is entitled to judgment as a matter of law, or if the affidavits or other proofs show that there is no genuine issue of material fact . . . ." This Court reviews de novo a trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

---

[2] The trial court relied on *In re VanConett Estate*, 262 Mich App 660; 687 NW2d 167 (2004), in support of its ruling.

The parties do not dispute the trial court's determination that Carlton and Viola's agreement to execute mutual wills is valid and that they agreed not to revoke the wills that they executed. The agreement stated, in pertinent part:

> The parties agree that on the death of the survivor, all of the property of which the survivor dies possessed is to be held in trust for the benefit of their granddaughter, Melady Cady, during her life. Upon the death of Melady Cady, the Trustee shall divide the balance of this Trust into equal separate shares so as to provide one (1) share for the issue of Melady Cady, one (1) share for Arletta Cady or her issue if she fails to survive said division, and one (1) share for Carlton Leix or his issue if he fails to survive said division.

The parties also do not dispute that after Viola's death, Carlton transferred money in various accounts so that Melady became a joint owner or beneficiary, and thereby upon Carlton's death she received the assets directly, rather than as a lifetime beneficiary of a trust. One of the effects of the transfers was to divest the trust of assets that the contingent trust beneficiaries might have received upon Melady's death.

The issue presented is whether an agreement to execute mutual wills limits a surviving spouse's ability to dispose of the assets that the parties held jointly as he or she chooses.

> An agreement to make mutual wills, or the execution of wills in pursuance of such an agreement, does not bind the testators to keep the property, covered thereby, for the intended beneficiaries under such wills, or prevent them from making such other disposition of it, either *inter vivos* or by will, as they may desire and mutually agree, while both or all still live. [*Phelps v Pipher*, 320 Mich 663, 670; 31 NW2d 836 (1948) (citation and quotation marks omitted).]

However, upon the death of one of the parties, the agreement (not the will) is irrevocable. *Id*. at 669.

"Upon the death of one party to a contract to make mutual will[s], the agreement underlying the will becomes irrevocable and right of action to enforce it [is] vested in the beneficiaries." *Schondelmayer v Schondelmayer*, 320 Mich 565, 572; 31 NW2d 721 (1948) (citation and quotation marks omitted). Thus, when the agreement to make mutual wills provides for the disposition of specific real property to a particular party, that party may obtain injunctive relief to prevent a surviving spouse from disposing of the specified property in a manner contrary to the agreement. *Id.*

As presented, the issue whether Carlton's transfer of assets breached his agreement with Viola involves two considerations: (1) whether assets that are held jointly by the contracting parties are subject to an agreement to make mutual wills and (2) to what extent does an agreement to make mutual wills restrict the surviving spouse's ability to transfer assets.

A

Respondents contend that *In re VanConett Estate*, 262 Mich App 660; 687 NW2d 167 (2004), controls this case and establishes that "jointly held assets are not subject to an agreement to make mutual wills." In *VanConett Estate*, Herbert and Ila VanConett (a married couple) and Florence VanConett owned real property as joint tenants with full rights of survivorship. *Id.* at 667. After Florence's death, Herbert and Ila continued to hold the property as joint tenants with full rights of survivorship. *Id.* This Court determined that Herbert's and Ila's wills revealed a clear expression of their intent to enter into a contract to dispose of their property in the manner expressed in their wills and that the surviving spouse's will would become irrevocable after the first spouse's death. *Id.* at 664-665. After Ila's death,

Herbert transferred the real property to the defendants. After Herbert's death, his estate brought an action to recover the property. This Court held that his estate lacked standing to seek return of the real property to the estate because the property was not covered by the couple's contact to make a will:

> Property held as joint tenants with full rights of survivorship automatically passes to the surviving tenant(s) at a tenant's death. 1 Cameron, Michigan Real Property Law (2d ed), § 9.11, pp 306-307. *Because title passed instantly at Ila's death, it would not have been part of her estate and would not be covered by the couple's contract to make a will.* Therefore, the estate has no right to seek its return. This is true even though the VanConetts' wills purported to apply to "all our property, whether owned by us as joint tenants, as tenants in common or in severalty." Certainly, the VanConetts could not destroy the survivorship right through their wills because a will has no effect until the testator's death. The VanConetts' contract to make a will did not expressly indicate that the couple wished to terminate their joint tenancy and destroy the survivorship rights attached to it. No authority suggests that merely expressing a desire to end a joint tenancy carries out the task of terminating a joint tenancy with rights of survivorship. Therefore, we conclude that the VanConetts' wills did not terminate the survivorship rights of their joint tenancy. The property passed to Herbert immediately at Ila's death and the estate lacked standing to seek its return to the estate. [*Id.* at 667-668 (emphasis added).]

In other words, "the estate did not have standing to bring a cause of action concerning the real property because the real property passes outside the Van-Conetts' wills." *Id.* at 662.

Respondents' contention—that *VanConett Estate* indicates that, in every instance, an agreement to make mutual wills does not apply to property that the contracting parties own jointly at the time the first testator dies—is incompatible with decisions of the Michigan Supreme Court.

For example, in *Schondelmayer*, Charles and Cathrin Schondelmayer jointly held title to real property as tenants by the entirety. *Schondelmayer*, 320 Mich at 568. The Court determined that they agreed to execute and did execute a joint and mutual will. The will stated that the survivor would pay the funeral expenses and just debts and " 'thereafter become the sole owner of any and all property owned by either or both of them. The said survivor shall live as he or she has been accustomed, using so much of the income or principal as may be necessary for his or her comfort of [sic] convenience.' " *Id.* at 571. The will then specified that each of the Schondelmayers' three sons was to receive a specific farm. *Id.* at 568, 571. Corna Schondelmayer, the plaintiff, was to receive real estate that included the home farm and the balance of the estate after certain costs. After Charles's death, the relationship between Cathrin and the plaintiff deteriorated. Cathrin claimed that she had the right to dispose of the property, including the home farm, by will and also stated that she intended to sell it. *Id.* at 573. The plaintiff sought specific performance of his parents' agreement to make a joint and mutual will and an injunction restraining Cathrin from disposing of the property in violation of the terms of the joint mutual will. The Court concluded that Charles and Cathrin had agreed that the will of the survivor would dispose of the estate in accordance with the terms of their joint and mutual will and that the agreement became irrevocable upon Charles's death. *Id.* at 571-572, 575. The Court affirmed the trial court's grant of injunctive relief, concluding that the property that Charles and Cathrin held jointly at the time of Charles's death was subject to the parties' agreement to execute a mutual will. See also *Getchell v Tinker*, 291 Mich 267; 289 NW 156 (1939) (involving an agreement to devise specified real property that the contracting parties owned jointly).

Respondents' contention that the agreement to make mutual wills did not apply to the assets that were jointly held by Carlton and Viola, and which therefore passed to Carlton after Viola's death, is unpersuasive. It is difficult to reconcile the statement in *VanConett Estate*, 262 Mich App at 668, that property that passed instantly at the death of the contracting party would not be covered by the couple's contract to make a will, with the Supreme Court's holdings in the cases cited earlier. We therefore conclude that the holding in *VanConett Estate* should be limited to the particular circumstances in that case, in which the contract to make a will was within the wills themselves.

B

In regard to whether an agreement to make mutual wills restricts the surviving spouse's ability to dispose of assets absent express limitations in the agreement, Michigan caselaw is not well developed. Appellant relies on *Schondelmayer*, 320 Mich 565, *Getchell*, 291 Mich 267, and *Carmichael v Carmichael*, 72 Mich 76; 40 NW 173 (1888). However, those cases involved agreements to convey specific property. Appellant does not claim that the agreement in this case contained language designating specific property or language prohibiting the surviving spouse from transferring assets. Rather, appellant asserts, "A corollary of the rule that the surviving co-maker of an agreement to make a mutual will is irrevocably bound by that agreement after the death of the other co-maker, is that the surviving co-maker cannot transfer assets in a manner that would defeat the agreement."[3]

---

[3] This Court's decision in *VanConett Estate*, 262 Mich App at 665, touched on that issue very briefly. Before the Court explained that the contract did not apply to the real estate at issue, the Court considered the

The uncertainty in the law is reflected in an order that the Supreme Court entered when it initially granted leave to appeal in *VanConett Estate*. The order directed the parties to address, in part,

> whether the mere fact that Herbert and Ila VanConett entered into a mutual will imposes restrictions on the surviving spouse's power of disposal despite the absence of express contractual or testamentary limitations on the power of alienation, (3) the source and nature of such a restraint if it is contended that Herbert VanConett was so restrained from disposing of his estate, and (4) whether any secondary authority in wills and estates law (e.g., hornbooks and treatises), or practice in the field, supports the proposition that a mutual will imposes restrictions on the surviving spouse's power of disposal in the absence of express contractual language or testamentary limitations on the power of alienation. [*In re Vanconnett Estate*, 474 Mich 999 (2006), vacated and lv den sub nom *In re VanConett*, 477 Mich 969 (2006).]

The directive to consult secondary authority suggests that the Court believed that the issue was unsettled in Michigan.

Courts in other jurisdictions have differing views concerning whether the surviving party to a contract to make mutual wills is limited in the right to dispose of property after the death of the first party. See Anno: *Right of party to joint or mutual will, made pursuant to*

---

plaintiffs' argument that Herbert received only a life estate and therefore had no right to dispose of the property. This Court stated, "Unlike in *Quarton* [*v Barton*, 249 Mich 474; 229 NW 465 (1930)], Herbert received a fee simple estate in the couple's property at Ila's death; hence, he was free to dispose of the property as he wished, and his beneficiaries were only entitled to the remainder." *Id*. Arguably, the statement supports the position that absent limiting language in the agreement, an agreement to make a will does not impose any limitations on a surviving spouse's right to dispose of property. However, because the Court ultimately concluded that the real estate was not covered by the agreement, the Court's statement that Herbert was free to dispose of the property as he wished (evidently without regard to any obligations from the agreement) was dictum.

*agreement as to disposition of property at death, to dispose of such property during life,* 85 ALR3d 8; 79 Am Jur 2d, Wills, §§ 687-688, pp 736-738; 97 CJS, Wills, § 2056, pp 659-661. Some jurisdictions allow the surviving spouse in that circumstance to use the property for support and ordinary expenditures, but not to give away considerable portions of it or make gifts that defeat the purpose of the agreement:

> Where an agreement as to mutual wills does not define the survivor's power over the property, but merely provides as to the disposition of the property at his or her death, the survivor may use not only the income, but reasonable portions of the principal, for his or her support and for ordinary expenditures, and he or she may change the form of the property by reinvestment, but must not give away any considerable portions of it or do anything else with it that is inconsistent with the spirit or the obvious intent and purpose of the agreement.
>
> ... [T]he surviving spouse cannot make a gift in the nature, or in lieu, of a testamentary disposition, or to defeat the purpose of the agreement. [97 CJS, Wills, § 2056, pp 660-661.]

Conversely, in other jurisdictions,

> [t]he courts do not assume that the parties to a joint and mutual will intended to restrict either party from disposing of property in good faith by transfers effective during his or her lifetime, unless a plain intention to this effect is expressed in the will or in the contract pursuant to which it was executed. Nothing short of plain and express words to that effect in a contract to execute wills with mutual and reciprocal provisions is sufficient to prevent one of the testators from disposing of his or her property in good faith during his or her lifetime, notwithstanding the death of the other testator. [72 Am Jur 2d, Wills, § 688, p 738.]

Section 17 of the ALR annotation collects cases that address the surviving spouse's authority to dispose of

property when the agreement or will leaves to designated beneficiaries property that the survivor may own at the time of the survivor's death or contains similar provisions. The annotation states in § 17[a] that such provisions "have been construed by some courts as indicating a desire on the part of the testators to give the survivor full authority to dispose of the property during the survivor's lifetime." 85 ALR3d, pp 50-51. Section 17[b] of the annotation collects cases taking a more limited view as well, including those "[h]olding that the survivor could dispose of the property only for such things as necessities or reasonable needs" and rejecting claims "that the survivor was given full power of disposition by the provision in a joint or mutual will which left to the beneficiary, at the survivor's death, only that property which the survivor might own at his death, or the like." *Id.* at 52.

As quoted in *Murphy v Glenn*, another treatise states:

> "A general covenant to devise, which does not refer to specific property, does not prevent the promisor from making conveyances during his lifetime. Such a covenant has been held not to prevent him from making gifts during his lifetime, if reasonable in amount and not made to evade performance. If the contract provides for devising or bequeathing all that the promisor owns at his death, he may convey his property during his lifetime if such conveyance is not in fraud of the rights of the promisee. A contract to devise all of the property of which the promisor should die possessed was held not to reserve to the promisor the right to convey any considerable part of the property gratuitously." [*Murphy v Glenn*, 964 P2d 581, 586 (Colo App, 1998), quoting 1 W Page, Wills, § 10.23 (Bowe-Parker rev ed, 1960).]

In *Murphy*, 964 P2d at 586, the court cited eight cases from other jurisdictions as supporting

the proposition that a party who is bound by a contract to make a will may make reasonable gifts during his or her lifetime and use the property for reasonable living expenses, but may not transfer the bulk of the estate in a way contrary to the terms of the agreement embodied in a mutual will.

*In re Chayka Estate*, 47 Wis 2d 102; 176 NW2d 561 (1970), provides an example of a court invalidating *inter vivos* transfers of property to avoid commitments made in a mutual will on the basis that the transfers breached the covenant of good faith that accompanies every contract. As indicated in the syllabus of the Wisconsin Supreme Court, a husband and wife executed a joint, mutual, and reciprocal will in which they bequeathed to each other all their real and personal property and provided that "after the decease of both of us, the whole of said real estate and personal property of whatever nature and wherever located that we may own at the time of the decease of the survivor of us" was to go to a specified beneficiary. *Id.* at 104. After the husband died, the wife married the appellants. She conveyed parcels of real property to herself and the appellant as joint tenants, gave the appellant bonds as a gift, and transferred funds into a joint account in her and the appellant's names. After her death, the probate court ordered the appellant to deliver the bonds and determined that the properties the wife had placed in joint tenancy were part of her estate. The Wisconsin Supreme Court rejected the appellant's contention that the transfers were valid, stating:

> Appellant contends that Evelyn Flanagan Chayka complied with her agreement with her first husband by leaving unrevoked the will giving all of the property she possessed at the time of her death to Robert W. Flanagan. This, as another court has well stated it to be, is "a mere play upon words." What she in fact has done has stripped nearly all of

the flesh from the bones, leaving only a skeleton for testamentary disposition to Robert W. Flanagan. This is a compliance in form, not in substance, that breaches the covenant of good faith that accompanies every contract, by accomplishing exactly what the agreement of the parties sought to prevent.

. . . The duty of good faith is an implied condition in every contract, including a contract to make a joint will, and the transfers here violate such good faith standard by leaving the will in effect but giving away the properties which the parties agreed were to be bequeathed at the death of both to a designated party. The contract to make a will, once partially executed and irrevocable, is not to be defeated or evaded by what has been termed "completely and deliberately denuding himself of his assets after entering into a bargain."[8]

---

[8] "Should it be held that the promisor is always left free to defeat the effect of his promise by completely and deliberately denuding himself of his assets immediately after entering into the bargain, it would seem that the contracts could serve very little purpose other than that of being either gambling devices or instruments of fraud and would be unworthy of legal protection. * * * A party to such a contract should be made to understand clearly that the law does not permit a man to have his cake and eat it too." Sparks, Contracts to Make Wills, (1956), pages 51, 52. See also: 94 C.J.S. Wills s 119, p. 881, stating: "Agreements based on valuable consideration to make a particular disposition of property will not be allowed to be defeated by a conveyance to persons who are not bona fide purchasers, during the lifetime of the promisor."

---

[*Chayka Estate*, 47 Wis 2d at 107-108 (citations omitted).]

Similarly, in *In re Erickson Estate*, 363 Ill App 3d 279; 841 NE2d 1104 (2006), the court invalidated transfers as being violative of the implied duty to act in good faith

and contrary to the purpose of a joint and mutual will. The husband and wife executed a joint and mutual will in which each bequeathed to the survivor the entire estate "as the survivor's property absolutely," and after the survivor's death, to specified children in specified amounts. *Id.* at 280. The husband died first. Five days before the wife's death, she conveyed three tracts of real property, each for $10, to two daughters and a grandson. A son filed a complaint to have the parcels returned to the estate. The defendants argued that the agreement gave the property to the survivor absolutely and that she was free to dispose of it as she saw fit as long as she did not revoke the joint and mutual will. After noting that the contract underlying a joint and mutual will becomes irrevocable upon the death of the first testator, the Illinois Appellate Court stated:

> Here, five days before her death, Lea attempted to circumvent both the terms of the joint and mutual will and her contractual obligations thereunder to dispose of her property by essentially giving it away. Lea's actions violate the spirit and purpose of the joint and mutual will, as well as the implied duty to act in good faith—a duty that is part of every contract. See *Bank One, Springfield v. Roscetti*, 309 Ill.App.3d 1048, 1059-60, 243 Ill.Dec. 452, 723 N.E.2d 755, 764 (1999) ("Good faith requires the party vested with contractual discretion to exercise it reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties"). The term "absolutely" does not give Lea the power to upset the dispositive scheme.
>
> We agree with defendants that *Helms* [*v Darmstatter*, 34 Ill 2d 295; 215 NE2d 245 (1966)], *Rauch* [*v Rauch*, 112 Ill App 3d 198; 445 NE2d 77 (1983)], and other decisions (see, *e.g., Orso v. Lindsey*, 233 Ill.App.3d 881, 887, 174 Ill.Dec. 403, 598 N.E.2d 1035, 1039 (1992)) leave open the question to what extent the surviving spouse may use the property upon the death of the other testator: "It may well be that they intended that the survivor should have the absolute

right to use the entire *corpus* for life, but only upon the
condition that the property owned by the survivor upon his
or her death would pass in accordance with the terms of the
joint will." *Helms,* 34 Ill.2d at 301-02, 215 N.E.2d at 249.
Interesting questions remain as to whether Lea could have
sold some property to make a modest gift to a charity or to
travel the world. We need not analyze those possibilities,
and we need not decide whether Lea, after Charles's death,
could have sold or given this property at a different time or
under different circumstances. The undisputed facts estab-
lish Lea disposed of the property five days before her death.
She received $10 for each parcel. No facts establish Lea
could have had any intention other than to circumvent the
dispositional scheme. These transfers are not permitted by
the will. [*Id.* at 284.]

In contrast, the approach adopted in *Ohms v Church
of the Nazarene, Weiser, Idaho, Inc,* 64 Idaho 262; 130
P2d 679 (1942), focused on enforcing the terms of
agreements to make wills as they are written. In that
case, the husband and wife made mutual, reciprocal,
and concurrent wills in which each bequeathed to the
survivor all real and personal property owned at the
time of his or her death, and in the event that the
spouse predeceased the testator, to the husband's chil-
dren and grandchildren. The husband and wife also
executed a mutual contract in which they agreed that
all property owned by the last one dying should go to
the husband's children and grandchildren. After the
husband died, the wife made other wills that conflicted
with the agreement. After being advised that she could
not will the challenged property to the church, she
revoked the inconsistent wills and instead deeded the
property to the church. After the wife's death, her
husband's children and grandchildren brought an ac-
tion to set aside the deed on the basis that the transfer
violated the purpose and intent of the couple's contract.
The Idaho Supreme Court recognized that there were

decisions supporting the view that the transfer was invalid as a subterfuge, but ultimately concluded, "It is better to give effect to the contract as made by the parties than attempt construction by implication or insertion by inference." *Id.* at 682. "If it was the intention of the parties that what each might receive upon the death of the other should be kept intact and passed on without any diminution thereof to Otto Ohms' children, the contract should have so stated, which it did not." *Id.* In addition to noting the absence of any limitation in the parties' agreement, the court referred to other facts that bolstered the reasonableness of validating the disposition (e.g., the support provided by the church, the wife's contribution to retention of the property, the husband's evident desire that the realty be in a different category than other property). However, the crux of the decision was the recognition that "[c]ourts should construe contracts according to the plain language used by the parties in making them, and . . . should not, in this or any other case, substitute what we may think the parties should have agreed to for what their contract shows they did agree to." *Id.*

We reject appellant's invitation to recognize implied limitations on the transfer of assets by the surviving spouse in the case of an agreement to make mutual wills. With respect to other contracts, this Court has explained:

> The main goal of contract interpretation generally is to enforce the parties' intent. But when the language of a document is clear and unambiguous, interpretation is limited to the actual words used, and parol evidence is inadmissible to prove a different intent. An unambiguous contract must be enforced according to its terms. The judiciary may not rewrite contracts on the basis of discerned "reasonable expectations" of the parties because to

do so is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy. [*Burkhardt v Bailey*, 260 Mich App 636, 656-657; 680 NW2d 453 (2004) (citations and quotation marks omitted).]

These principles apply to a contract to make a mutual will. Appellant acknowledges that the contract does not expressly limit the parties from transferring assets. Unlike some other jurisdictions, "Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." *Dykema Gossett PLLC v Ajluni*, 273 Mich App 1, 13; 730 NW2d 29 (2006) (citations and quotation marks omitted), vacated in part on other grounds 480 Mich 913 (2007). Regardless of whether the transfers were made for the purpose of avoiding the testamentary disposition, the agreement did not restrict Carlton from disposing of the assets as he saw fit.[4]

Affirmed.

---

[4] We need not consider appellant's challenge to respondents' assertion that jointly held assets are not assets "possessed" by the decedent at the time of his death. The complaint did not present this theory; rather, the complaint concerned whether Carlton breached the agreement by disposing of the assets during his life. Moreover, the issue is inadequately briefed by appellant. He raises it in his reply brief and only cites two cases, neither of which addresses the meaning of "dies possessed."